The next matter, number 24-1770, number 24-1771, 24-1772, 24-1773, and 24-1774, Securities and Exchange Commission v. Gasarch et al. At this time, would Counsel for the Appellant Sexton please introduce himself on the record? He has a 13-minute argument. Good morning, and may it please the Court. My name is Rob Silverblatt on behalf of Appellant Paul Sexton, and I'd like to reserve three of the 13 minutes for rebuttal. The main issue in this case is that the District Court imposed more than $46 million in disgorgement under a joint and several liability theory that the SEC never requested and that it does not meaningfully defend on appeal. This was error. Well, the government says it wasn't necessary. The government says it wasn't necessary, but when you remove that label, you have a finding by the District Court that it is impossible to determine disgorgement on an individualized basis. And I draw the Court to two findings by the District Court. The first is that the District Court said that the evidence, quote, does not show that ill-gotten gains have been obtained and retained by the individual defendants, much less in the amounts requested by the SEC. That's at JA-3882. And on that same page, the District Court found that, quote, actual accrual to each of the defendants cannot be shown. And these are findings that we believe are fatal to any attempt to impose disgorgement on an individualized basis. The District Court was very clear, repeatedly throughout the opinion, that the only way that it could get to disgorgement was through joint and several liability. It was the glue that held together the entire disgorgement award, and it said over and over again, I don't need to find what each individual defendant got because of joint and several liability. And it, in fact, imposed essentially a de facto rule that joint and several liability is okay as long as there is an alleged conspiracy, which is not the standard. Did the District Court cap the liabilities as to the other defendants aside from Sharp? Yes. The liabilities are capped at the balances in the so-called Q system. But what's important is that the District Court didn't find that that was a reasonable approximation of each individual defendant's ill-gotten gains. The District Court instead found that it was impossible to determine what each individual defendant's gains were because Q is not actual money. Q is not a bank account. I think it's helpful to understand what Q... Didn't the court say that it functioned as a bank account because the defendants could tap into it for personal expenses just like you can tap into an actual bank account? And someone paid their daughter's tuition or something? In theory, yes, but there is no evidence... In practice in this case, correct? There is no evidence that the amount of funds, the $46 million ever existed in the real world. The SEC expressly chose not to look at bank records in this case, and yes, there is some evidence in extremely limited cases of funds being expended, but for Appellant Sexton, for instance, that's about 4% of the total disgorgement amount, and there's no evidence that it's tied to the specific activities in the 14 issuers that are the subject of the SEC's case. So the SEC may... Each defendant had their own special access to their own particular Q money, is that correct? There is no evidence that the individual defendants actually had access to the funds that are at issue. There were accounts that were supposedly in the names of individuals, but whether there was money in those accounts and whether that money was actually ever obtained by the individual defendants, that is the distinction that is important to draw, and the district court expressly found time and time again that there was no basis to determine that the individual The SEC does not challenge those factual findings. They would be subject to clear error review, but the SEC doesn't challenge them at all. Appellants cited repeatedly in their papers the findings by the district court that there was no evidence that the funds were obtained and retained by the defendants, and the SEC has addressed them only in a footnote to say that they're not challenging the district court's finding on prejudgment interest. So that finding is fundamentally incompatible with any type of individualized discouragement award. The district court essentially said, I cannot do this. It is impossible to do this on an individualized basis without relying on joint and several liability. So joint and several liability really was the only way that the district court could get at that outcome, particularly in a case in which the SEC never made any meaningful efforts to actually find out what funds, if any, were received by the defendants. They conceded they didn't look at bank accounts. Their expert testified at trial. Each individual defendant had an association with one or more of the 14 accounts in question. Is that correct? The number 14 is the number of issuers. Right. And each individual defendant had some connection with the 14 issuers. There is no evidence of that, Your Honor, other than the SEC's reliance on the Q system itself. There are securities for which there was essentially no testimony at trial, other than the fact that there was trading in the securities. But we pointed to a couple in our brief where there is no individualized evidence of the defendants being engaged in activities involving those securities. So from just a causation perspective, that evidence is lacking, and this court recently made very clear in Commonwealth Equity that that type of generalized determination is insufficient, and there must be evidence as to a connection between the defendants and each of the subject securities, and not only that, but a determination that there was wrongdoing with respect to each of the securities. The SEC's main argument is that there was a scheme to conceal beneficial ownership in excess of 5%, but they only actually presented evidence of ownership in excess of 5% for one of the 14 securities, and even then, only for a limited period of time. And from that evidence, the district court found that there was misconduct with respect to 14 securities over the entire period of time without that individualized evidence. So that is a separate basis for undoing the district court's discouragement order. We think that the main basis for undoing it is joint and several liability. I think that I'm just missing part of your joint and several liability, so I'm sorry if I'm a little bit confused, but setting aside your complaints about the Q system, if you set those aside, the amounts were issued jointly and severally against Sharp and against the other defendants. But why is doing that a problem if those amounts are capped as to the other defendants? Because the district court expressly found that those caps cannot be a reasonable approximation of discouragement. The district court's findings were that even those capped numbers were not backed by evidence that the individual defendants ever received those funds. So the caps he put on are just imaginary? They were derived from the balances in the so-called Q system, but he found that those balances do not mean that the individual defendants ever received the money. It could be monopoly money for all that we know. There's no evidence that that money existed in the real world, that they had access to it, that they ever obtained it. That's why he declined, even under the capped amounts, to apply prejudgment interest, because there's no evidence that they actually ever received that $46 million. Discouragement is based on receipt of funds. There's no evidence that those funds existed, let alone that they accessed them, and that is a finding of the court that it is impossible to determine, even under the cap, what actually went into anybody's pockets. And the district court repeatedly said, I don't need to determine that, because it's enough that Sharp got the money, or it's enough that somebody else got the money. That's problematic in and of itself, because Sharp is now jointly and separately liable for $46 million, even though he was not participating in the case at that point and had a default judgment entered against him for only $20 million. But the district court's reason for its decision was that he doesn't need to determine if the capped amount ever actually accrued to any of the individual defendants, and that is a finding that the SEC does not challenge in this appeal. So is there funds, according to the accounting in the Q system, that are still there? In other words, is the SEC, in terms of the discouragement, saying that the defendants have to give up what's in the Q, or they have to pay above and beyond whatever may be in the Q? The SEC's argument is that the money was dispersed from the Q system. But there's no evidence that the money was actually dispersed from the Q system, and there's no evidence that it ever actually existed in the Q system to begin with. Well, they compared it to actual trading. Didn't their experts say that trading occurred that resulted in this kind of profit? So the trading records only show that trades happen. So in our briefing, we compare Q to essentially a dual-function system. One of it is a brokerage system that tracks trades. The other is a bank with an ATM. And the SEC verified only the existence of trades. The allocation of profits could have been tested by looking at bank records or other evidence. The SEC consciously, as a litigating strategy, chose not to verify that the money was ever actually available to the defendants. But I'm asking, is their money actually there? We don't know that the money ever actually existed. All that we know is that trades happened, but the actual allocation of profits to defendants, I think the question of whether it's there is, it presupposes that it was once there. And we don't even know that. We don't even know that it was once there. But we know that there were trades. We know that there were trades, but what was done with the funds is not something that the SEC has established. But does a trade necessarily result in funds? Regardless of where it goes, does a trade necessarily result in funds if the trade is for profit? There is a financial component, but what we don't know is that the funds were actually ever made available to the appellants as opposed to being used for any number of purposes, or even that the volume of funds is such that the SEC says. There was no testing of that second part of the Q system. The SEC has acknowledged that they didn't look at bank records. They acknowledge that they didn't know who received the cash. Do you have some rebuttal? Thank you. At this time, would counsel for Appellant Friesen please come to the podium and introduce herself on the record to begin? Thank you very much. My name is Miranda Fritz. I represent Jackson Friesen. I was one of the defendants that actually went to trial, where we spent a lot of time talking about these Q records. My arguments to this court involve not only reversing disgorgement, but also liability. But in response to some of the questions, I want to spend a moment talking about what Q was. On the one hand, it recorded sales of stock. Where did that money go? It went to Fred Sharp. Sales of stock were being conducted by Fred Sharp and his company through their nominee entities. That's as much as we know. The district court agreed that what we know is the money accrued to Fred Sharp. What we also know from the trial is Fred Sharp is a fugitive and a crook. Then what we end up with is for the critical elements of these offenses, Section 5 and 13D, the government relies, instead of getting internal disbursement records or records of defendant's receipt of funds, they rely on these accounts. I would invite, I would ask, I would beg the court to look at what they're relying on. What, I described this during the trial as gibberish. Here's what it is. It is page after page of entries with a column on the right-hand side that says balance that in no way corresponds to the debits or credits. The balance is— I mean, what we also have is the expert testimony, right, and you, which sort of explains that, I think, and was subject to cross-examination. What the expert did, and I discussed this in the brief, is he totaled all incoming amounts to a defendant and decided that's what the amount was. This page after page shows millions of dollars in debits. I ask him, did you look at that? Did you see that Fred Sharp would allocate something in and then Fred Sharp would take it out? And he said no. In response to your Honor's question— Okay, but doesn't that go to weight of the evidence, credibility? You have a witness testifying, you have a document, and you have a jury. I believe, and I've argued, the Q record was never authenticated properly, was not reliable, and the judge's decision to admit this as a business record was error. On that basis, I think the finding of liability is error on the one hand, and— But if we disagreed with that, you did have expert testimony. Expert testimony of what I just described, which is you can take this document, you can add up everything that Fred Sharp allocated to someone, and you can get their number. But the case law is very, very clear now that in order to order disgorgement— The defendant had a code name, correct? There were, yes, and that was one of the things the SEC loved and relied on. But that doesn't alter whether or not there was sufficient proof. Well, if there was evidence that matched the code name to the particular defendant, and at least there was evidence of some disbursements to that particular defendant, you're saying no? That's where the evidence is lacking. And the district court was very clear about that, that he could not find that the money went any farther than Fred . . . Somebody's tuition was paid. Somebody's child's tuition was paid. That's evidence of disbursement. There is evidence of a small disbursement, I think a total of $10,000. But doesn't that prove that there was, in fact, at least some disbursement? What it proves is Fred Sharp allocated into an account on a computer $12 million. And then, Your Honor asked what the balance was at the end of it all? At the end of it all, if you look at the records, the balance is a negative, hold on, negative $83,000. This is year after year of unexplained, unauthenticated entries that were used by the SEC to come up with a fictitious figure that really is inconsistent with the case law being very clear and Judge Young agreeing. You've got to put it into the pocket of the defendant in order to order disgorgement. Thank you. Thank you. Thank you, Counsel. At this time, would Counsel for Appellant Gassarch come up and introduce themselves on the record to begin? Good morning, Your Honors. I'm Karen Pickett. I represent the appellant, Yvonne Gassarch. I limited myself to two minutes today, which was, I don't think my husband would believe that because he said I could talk the meat off a bone. But I'm going to try to get through my points very quickly. I concur with everything my co-counsel said. I also went to trial and I understand that the judge made his ultimate ruling. But it's sort of unclear at the end whether it was coming in as a business record or a co-conspirator statement. But in any event, even with the expert that you asked about, Your Honor, he's just looking at these entries. He wasn't there. He doesn't know what they mean. And my client who worked- But experts don't have to be there. They're after- No, no, I understand. But he can't authenticate the entries themselves. Those were made by Fred Sharp, who was, as my co-counsel said, a fugitive justice who has a default judgment against him and who the evidence showed had complete control over these entries. There was evidence by the creator of the program, too. I'm sorry, Your Honor. There was evidence, there was testimony by the creator of the program. Yes, that was, I can't think of his last name, it was Feodor. He said that he and Fred, he was the administrator and Fred was the administrator. And they had complete control to change any of the entries. I do want to talk about if the court ends up remanding one of the issues specific to Mrs. Gessarch. And that is that there's a jury verdict form at A1553. And as the court knows, the jury found my client liable under 17A3 as a primary violator. But in the aiding and abetting section, found that she did aid and abet violations of section 17A1, 17A3, or section 10B, in the order on remedies, Judge Young agrees that you could read that to say that the jury only found that my client aided and abetted 17A3, which is a non-Sienta-based violation. And as the court knows, if the jury found a non-Sienta-based violation, the statute of limitations is five years, not ten years. And in my client's case, I would direct you to the exhibit 312 from trial, which is the entries relied upon by the so-called expert, the SEC accountant. And the first 670 entries predate the five years prior to the filing of the complaint. So it makes a significant difference. Again, I'm not agreeing that my client ever got that money. There was no, unlike the trading records, there was never any banking records shown of Fred Sharp, Custom House, my client. So there was never, even the expert admitted that he couldn't verify any of these so-called entries. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, would counsel for the Appalachian Securities and Exchange Commission please introduce yourself on the record to begin. Good morning, Your Honor. May it please the court. I'm Carrie Dingle on behalf of the Securities and Exchange Commission, and I'm here with my colleague Kathleen Shields today. I'd like to start by talking about this joint and several liability designation, because I think it is a bit confusing. But really what the district court was doing was being incredibly conservative in imposing an equitable remedy and ensuring that it fulfilled the requirements set forth by the Supreme Court in the Liu opinion. There were sufficient findings that the court made to establish that the amounts that each appellant received in their personal account in the Q system was a reasonable approximation of their ill-gotten gains. The court found that the entire enterprise was fraudulent, so Sharp's whole enterprise was fraudulent. The court found that Q was the accounting system for the enterprise. The purpose of the Q system was to conceal the proceeds of the fraud. The court further found that those records were highly accurate, that they were credible and reliable evidence of the illicit proceeds from trading in the 14 issuers. And that the Q account showed the transfer of proceeds to appellants and showed them spending money just like a bank account would, using them to pay. For example, Mr. Friesen directed Ms. Gasarch to wire money to pay his girlfriend's tuition, which I think is what Judge Thompson, you were referring to. But if you look at the commission's brief at pages 67 and- Their argument is that the disgorgement decision hinges on the government, excuse me, on the court's finding of joint and several. Do you disagree with that? I don't believe that it does, Your Honor. The court did something a little bit interesting, because normally when we think of joint and several liability, we think of two individuals being held jointly for one amount. What the court did here, and if you look at the language in the final judgments, which is what this court is reviewing. For example, I believe this is Mr. Sexton's final judgment at A3892 of the record. The court says defendant Sexton is jointly and severally liable with co-defendants Sharp, Friesen, and Veltweese for disgorgement of 42.5 million. With the amount to be disgorged by defendant to not exceed 17.3 million, representing profits gained as a result of the conduct on which he was found liable. So what the court was doing was saying, and this is in response to a specific instruction in lieu that said, it's not that you can't ever hold people jointly and severally liable, it's that you cannot hold a defendant jointly and severally liable for amounts that accrued to another in which he had no participation. So the court was finding that that $42.5 million in profits was the amount that these particular defendants, conspiring with each other, produced as a result of their violations. And so, but of that 42.5 million, Veltweese is then only held liable for the smaller amount of what was actually in his Q account. And the court expressly rejected the defendant's argument that the proceeds were not dispersed to appellant, that's at A3873 of the record. So the amounts were dispersed to appellants, but in response to the appellant's arguments that maybe Sharpe ultimately got some of this money or they weren't able to spend it all before the music stopped on the fraud. The court went this additional step and said, well, I'm also allowed to impose joint and several liability, and in this case, you all work together to create this much larger portion of proceeds. And so if I cap each individual defendant's disgorgement amount at what they were shown to receive in the Q system, then I'm really sort of dotting my I's and crossing my T's, being very conservative about that. What was the evidence of disbursement besides the tuition and a few other things that were mentioned in the briefs? So the way that the system worked is that there were accounts in the Q system for the issuers. Now the issuer accounts, the control group of Veltwee, Sexton, and Freeson actually owned those shares. But what they did was they rented these nominee companies from Sharpe. This was one of the services that Sharpe provided. So that they could break up their shares, transfer them to the nominee entities, and then the nominee entity was the paper owner. And then they used these offshore trading platforms that there was extensive testimony at trial about to sell the shares back into the market. So if you look at the Q system, there are those accounts for the issuers, and you see the proceeds coming in from the trades. That's what we were able to corroborate almost 100%, something like 97.8% of those using third party brokerages. Then you see there were ex-phone messages, these encrypted ex-phone messages of the control group talking to each other and giving directions to Ms. Gasarch about how to allocate those proceeds to individual Q accounts in the Q system. And so we showed the jury these ex-phone messages where Mr. Sexton, Mr. Veltwee, Mr. Freeson would say this is who gets how much and would send the instructions to Ms. Gasarch to do that. And then you can see the money moving into the individual accounts. At pages 67 and 68 of our brief, we summarized the evidence by the commission's accountant that showed these disbursements out of those accounts. All of the appellants had disbursements out of their accounts, and there was evidence that they took some of the money in cash. Now, they're claiming we didn't produce or look at full bank account records. We sought those records from the appellants. They asserted their Fifth Amendment rights in not producing those records. And so they used the Fifth Amendment as a shield to not have to produce the records, and now they're trying to use the lack of records as a sort of sword against the disgorgement amount. You could have subpoenaed the records though, right? Yes, Your Honor, but the commission believes that what was reflected in the Q account was corroborated and was accurate. And so that provides a reasonable approximation. Then the burden shifts to the defendants to show why that's not a reasonable approximation, or why they should get certain debits for that. Is there any money somewhere, or was it all dispersed somewhere? There is no evidence that there was still money in any of their accounts. All right, so disgorgement means that they gotta come up with some money. Exactly, Your Honor, and they have amounts that are frozen. That's what I was asking, they're frozen amounts. There are frozen amounts. That are real? Some of them, yes. Bank accounts and assets, there are frozen accounts that they could use to pay the disgorgement awards. Yes. If there are no further questions, the commission- Just to get back to the very first question that Judge, or I think it was the first question Judge Thompson asked you about disgorgement. You would say the disgorgement doesn't rise and fall on the joint and several. Exactly. No, we don't believe that it does. The commission didn't ask for these amounts to be joint and several. Here we think that the joint and several designation only works in the appellant's favor, because they are jointly and separately liable for the control group, it's up to that 42.5 million. Which means that if any of the other co-defendants who are jointly and separately liable for the same amount pay their disgorgement amounts. Once it hits 42.5 million, any amount that's left over, that defendant wouldn't need to pay it. And there's a $22 million judgment against Mr. Sharp and various amounts against the appellant. So it can really only work in their favor. And we don't believe that the disgorgement award ultimately hinges on that. And so just so I can be clear though, you're saying that the fact that the district court found, or the SEC, sorry, found jointly, legally joint, that that's not problematic in any way because of the cap? Yes, Your Honor, because of the cap and because I think this is the sort of case in which joint and several liability would be appropriate. Generally, when the commission is able to apportion the money and show who got what. We do not request joint and several as a general matter, because apportionment is sort of one of the factors that courts look to. In deciding whether a joint and several award is permissible. But Lou said that you can still get joint and several disgorgement where there's concerted wrongdoing. And I think what Lou was concerned with was a case where you have, like the Biopoint v Takeout case from this court, where you have a relatively minor player in the fraud. Being held liable for the full amount that the entity fraudster took in, even though his role didn't directly create those proceeds. So he had relatively limited participation. And Lou is saying, you can still get joint and several liability, but you need to show concerted wrongdoing that produced those ill-gotten gains in order to be held jointly and severally liable for it. And here, each of the appellants has been held liable for amounts that are directly tied to their wrongdoing. So with respect- So they're saying that Judge Young specifically disclaimed any ability to individually apportion. Do you disagree with their interpretation of Judge Young's ruling? Yes, I strenuously disagree with that. And I think the court expressly rejected the contention that the proceeds were not dispersed to the appellants. I think Judge Young was responding to their arguments that maybe there wasn't sufficient independent corroboration with respect to every dollar in the queue system, but that is not required. The standard is a reasonable approximation. It's not complete corroboration with external documents. Any further questions? Thank you. Thank you, I'd ask the court to affirm. Three minutes for rebuttal. Please reintroduce yourself on the record, sir. Good morning, Rob Silverblatt on behalf of Appellant Paul Sexton. And I'd like to start where the SEC ended, because I think this is critical. The district court expressly found on numerous occasions that the balances in the queue system were not a reasonable approximation of what appellants received. And I'd start at JA 3877, where the district court says, given that Sharp was a co-conspirator in each of the conspiracies, the ill-gotten gains need not have accrued personally to each of the defendants. That they may have partially or entirely accrued to Sharp suffices to award discouragement. So the district court said it's possible that they got nothing, but yet I'm ordering joint and several liability, and that takes care of it. So it really was the glue that held this award together. On 3882, the district court found, as a matter of fact, while the queued data evidence verified by external brokerage records persuades this court that ill-gotten gains have been generated by the pump and dump scheme perpetrated by the defendants, irrespective of to whom among the co-conspirators the proceeds accrued, thereby necessitating discouragement. The same data does not show the ill-gotten gains have been obtained and retained by the individual defendants, much less in the amounts requested by the SEC, where actual accrual to each of the defendants cannot be shown, and where it is entirely possible that at least a portion of the ill-gotten gains may never have reached the pockets of individual defendants. It is not possible to speak with any reasonable degree of certainty that the defendants benefited from what resembled an interest-free loan. You also have page 3874, where the court points to evidence that not all of the funds were retained by the defendants. So there is no way, in light of these factual findings, to make a discouragement award work without joint and several liability, and the commission has pointed to not a single case post-lieu in which joint and several liability for discouragement has been imposed under remotely similar circumstances. In response to a question from Judge Thompson, the SEC noted that there are accounts that have been frozen. There is no evidence that the money in the accounts is derivative of any of the conduct at issue here. So yes, there is frozen money, but the SEC has not argued that those accounts are populated with proceeds that are ill-gotten gains. And this isn't entirely a consequence of the SEC's litigating decision in this case. The SEC could have issued subpoenas. It could have sought evidence. It chose not to. If I may just briefly finish this thought. And it asked the court to uphold on appeal a discouragement award that the district court has found, as a matter of fact, cannot stand on an individualized basis. That was error. OK. Thank you, counsel. Thank you. That concludes argument in this case.